23-40 Nancy Lara-Grimaldi v. County of Putnam, et al. And we'll allow everybody to take a minute to get the courtroom settled and everyone can come up to council table. I understand that Attorney Rankin would like to reserve two minutes for rebuttal for the appellant and that there will be five minutes of argument of keys for Attorney Summer and Collins. And I think the way these high school courtroom visits work they have the timetable and they're gonna go down and do another program. So don't take it personally. They're like, that guy got up for it when you got up. Mr. Rankin, whenever you're ready. Thank you, your honor. We're here on the tragic case of Alexandra Grimaldi. As your honors know, she hung herself in a jail cell on October 28th, 2015. And later died on May 13th, 2016 at the West Chester County Medical Center. She was only 23 years old. The three errors that are principally made in the district court's opinion are Judge Karras did not find that Nancy Grimaldi's conditions led to an excessive risk of suicide. He does take the inferences and says that her heroin withdrawal was likely to happen on the next day. And everyone knew that. That she had untreated bipolar disorder. And the inferences are that people knew that. And that four years prior she had attempted to commit suicide and that people knew that. He brought those inferences up but then didn't make the next step which is because of those inferences there was an excessive risk to health or safety which is of course the Darnell standard. Yeah, that's exactly where I want to ask some questions. I like the way you formulated it. Those conditions that a reasonable jury could find created an excessive risk to health or safety. Does it have to be a risk of suicide if suicide is what occurred? Or is it enough? Suppose we concluded that well, the suicide attempt was a long time ago. Everyone seems to agree that she was doing better in that regard and denied any kind of suicidal ideation. And I'm not sure, although it may be the case that a reasonable person could infer that someone in the throes of very serious withdrawal would be likely or at least it would be an unacceptable risk that they would kill themselves. I don't know how often that happens. But suppose a reasonable jury would think that, I don't think they would have or should have been expected to foresee that she would kill herself but clearly they should have known that she was going to be at risk of serious health consequences in the form of withdrawal. And if they did that under the jail practice, there would have been a 15 minute check instead of a 30 minute check. And then they would have either cut her down in time or discovered her withdrawal in time to treat it so that she wouldn't be in such misery. And that's enough to return a verdict. Your Honor has actually anticipated point two, which is it's our position that you don't need that. You don't need that. The jury should be instructed in effect. I mean, we're doing this in summary judgment but that the legal standard would be that if a reasonable jury could find there was an unacceptable risk to her health and if that had been reacted to accordingly, you the jury find that that was the proximate cause of their not detecting her suicide attempt in time to prevent it or keep it from being effective, you may return a verdict for the plaintiff. That is absolutely our position. And also the second point in one of the errors here because the standard in Darnell is just very clear. It's the condition posed an excessive risk to health or safety. Well, that's the formulation, but of course that formulation comes up in a particular context, right? So if the danger is they don't clear the ice or something like that and the guy fell on the ice and that was an unreasonable risk to his health and safety that you'd say that, but in most cases, what happens is they disregarded a serious enough risk and then that risk eventuated. It's a particular risk. And that's why I'm querying, do they have to find the particular risk? Because if it's a suicide risk, then we don't have any causation issues, it seems to me, because the suicide protocol would be constant observation. If it's just a generalized risk, then there's another problem with, then you get another problem, which is would a 15 minute, how do we know the 15 minute check would make a difference? Particularly given that apparently the officer didn't make the 30 minute check, but that's, maybe this is excessive parsing, but I'm just trying to figure out what the jury would have to find and therefore, what would be material issues for the jury in this record? Well, as indicated before, it's our position that you don't need to absolutely draw the line. I mean, I'm sure that the risk has to still be approximate cause, right? I mean, like you can't have it be, there's some harm happening and some risk and then some other harm happens. And then the ceiling falls down. Yeah, exactly. Of course, that doesn't do it, but that's what approximate cause is all about, right? To answer your honor's embedded sort of second question, which is how do we know that this actually takes us to suicide, right? The way, we know that in two different ways. First, if you look at A361, which is the suicide screening form, a significant number of the questions on the suicide screening form are about, are you on drugs? Are you withdrawing from drugs? Yeah, but doesn't that cut against you? Because the screening form asked those questions and the answers yielded an answer of low likelihood. So that's a problem, right? To say, well, the questions are on the form, they should have known, but the form itself says, ask these questions, total it up and we'll tell you it's a low risk. So are they supposed to think this is an inaccurate questionnaire? No, your honor. Because if you're saying that the fact that the questions are listed on the questionnaire alone should put them on notice of the excessive risk, presupposes that they should believe one part of the form and disbelieve another part, which is the totaling of the score. Do you understand? I do, sir, I absolutely do. At least with that one point, tell me what would be wrong with it. That logic. And this is also one of the errors in the ruling. At the time the form was done, Ms. Grimaldi was not in the throes of withdrawal. She had used 20 bags of heroin that day or shortly before. She was not in the throes of withdrawal. If they had done the exact same form, closer in time to when she committed the suit. But now we have two different things, right? One is, I think you were saying, by virtue of the questions being on the form, they were on notice. And that means they should have known. But now you're saying they should have done the form at a different time. So tell us what tells us that they should have known or that they were deliberately indifferent by not doing the form again. Is there something in the form that told them they had to do it again and how often? It's not that they need to do the form again. And I'm not suggesting that. At the time the form was done, we, I mean, I have some issue with how it was done, but not one that I'm bringing before your honors. It was fine. However, everybody knew that she was going to go into withdrawal the next day and that it was going to be problematic the next day. I thought the very next day she had a screening on the 25th. Didn't the nurse student, did Negro bring her and she had another screening on the 25th? There were, she had one meeting with the CALS protocols on the, it's actually the 27th and 28th. Or I may have the dates wrong. Yeah, I'll take your, the second day. Yes, they did. And there is an issue with that that I'd like to- That's the morning of the suicide attempt, right? Correct. Okay, so what's the problem there? I thought if you're saying they should have done a screening again and the screening the second time would have shown now a risk that they had to change what they were doing. I thought there was a screening the morning of the attempted suicide that did not tell the officers something different, that there was a different, a materially different risk level. Am I wrong? I may be wrong and correct me if I'm getting the record wrong. It's not quite like that, your honor. Yeah, so tell me how it is. It's close. So the screening happens that night of the 27th. And then they put her on what's called the COWS protocols, which is sort of a monitoring for opiate withdrawal. And the 27th is the intake day? Correct. Okay. And then the next day, there is a visit to medical. That's Nurse Stern's or something? A Diaz, I think. Okay, whatever that was. Stern's the one that did the first one. Okay, Diaz is the second one, okay. And there's something important about that, that I think that the record, that his honor at the district court level didn't quite get. And I do want to put this before your honors. They indicated that in the district court decision, that Ms. Grimaldi said that she expected to go into withdrawal later and wanted this cliodine later for the evening. That's what Judge Karas decided was in the record. We dispute that. The only record that says it was in the evening that she was worried about it is a, excuse me, statement that was made after the whole incident. All right, but now we're getting into, okay, I understand your argument about the facts. And I understand this is a distinct argument you have about the judge not drawing all reasonable inferences in favor of the defendant, including, I suppose, decisions to disregard certain types of evidence. In many instances, he did disregard a statement by one of the defendants saying, there's circumstantial evidence that can undermine it. I put it aside, here he didn't. But just to get back to the sort of the core argument that you have, where I think we were with the form and the idea that there, what is the nature of the risk that we should be asking that the, whether the officer should have known this risk, whether it's a risk of a health condition, whether we should be calling a risk of withdrawal or all the way a risk of suicide. And I understand you to be saying that, in this case, the health condition in question was a risk of withdrawal because suicide, I suppose, you're saying, is a sufficiently likely consequence of having withdrawal. What do you make of the fact that there was this screening that said she was also, not just at low risk of suicide, but she was having mild withdrawal symptoms and that her risk level from withdrawal was also whatever it was, low or mild, whatever the word was. I could understand if there was a risk assessment that told the officer she was at a risk of serious withdrawal symptoms, because then you can say, well, this is gonna be horrible and all sorts of bad things would very likely follow. But when the screening says mild, it seems to me, then all of a sudden we're converting the should have known risk into, not just should have known of withdrawal, but then you could say, well, should have known that she was on opiates. Because then you would say, well, it's natural that anybody who was on opiates is gonna suffer withdrawal and anybody who's gonna suffer withdrawal is gonna be a suicide risk, right? If you say just the fact of withdrawal is enough to get you to the likely result of suicide, whether through proximate cause or foreseeability or whatever. I mean, it seems to me that anybody who's an opiate addict is gonna have some withdrawal. We just don't know. It could be minor, it could be major. So when we have the evidence in the record that I think is undisputed, that the screenings were all predicting mild or low or whatever the word was, how do you then get from that to, and it was very predictable, that the kind of withdrawal she had might've had these various consequences. I have two responses to this, Your Honor. First, I'm not sure factually that's quite there. And so let me, I just want to point to the record that where this distinction is dealt with. It's the, it's A2288 is where is the statement of the mild withdrawal and the withdrawing in the evening. The actual COWS protocol sheet is at A2216 and 2217. And the lower court conflated that and basically just accepted the, what we propose to be the self-serving statement on the one that was made after the suicide. So we do generally factually have an issue with Your Honor's recitation with it. And we believe of course, that we should get the inference. Now to address Your Honor's second point, if, I just wanted to show you those two pieces of the record because I think that's important for the question that you raised. The issue with her in particular, no, of course, anyone that has any opiate, anything doesn't necessarily draw a direct line to suicide. I mean, that would be asking well too much of the standard. However, that's not what we have here. I mean, just as a very general matter, we, first of all, we have a massive amount of heroin use. We're not talking one bag, we're talking 20 bags a day for years. We have unmedicated bipolar disorder. We have depression. We have prior suicide attempts and we have a request for medication to help deal with the withdrawal. We have a lot more going on here than just somebody who has an opiate use disorder. So to summarize what you're saying is the, it slightly oversimplifies what you're saying, but past suicide attempts plus likely opiate withdrawal from heavy use of heroin plus bipolar disorder minus any affirmative statement of suicidal ideation at the time equals a reasonable jury could say that they should have been aware of A, a suicide risk is your primary point, taking all of that together. And therefore there's not really much of a proximate cause problem, or at least B, a risk of serious withdrawal symptoms which would have resulted in greater scrutiny and that a reasonable jury might draw or could draw the link of proximate causation that if they were going in there every 15 minutes that they would have prevented the suicide. That's exactly right, although I would add one thing to the list that you're, The list of the, Of the, in the equation. Yeah. Is the policy that was testified to by the sheriff who's the chief decision maker for the county said that someone in active withdrawal needs to be under constant surveillance. Let me just back up because I think the way we're talking about it is helpful right now but sort of the two possible views, right? A and B as Judge Lynch laid out as the A is, I can't actually remember which is A and which is B now. But the one which is, if you take the withdrawal symptoms, let's call them mild, let's just accept it. Except for the sake of argument that they were designated mild and that's what they were on notice of. But when you add the plus factors, which is bipolar, the prior suicide attempt four years earlier, you put the combination of those things together and then you get to, should have been under the suicide risk, right? And I guess, but that, pausing there, I think we are saying that if you're going to add plus factors, then we're not, then we are saying that then we're asking the question not just was there a generic health condition but was there a health condition that would lead to a suicide risk, right? Because a prior suicide attempt seems relevant only in predicting, not that she will just have withdrawal problems that will have some bad consequences but specifically could lead to suicide. So when we're adding those plus factors, aren't we saying that we are buying into or we have to buy into what I think is the defense's view that the thing that we're asking whether the officer should have known was the risk of suicide? No, I don't know. I think what you're saying is you think you meet that standard but you don't think you have to. So you are making the argument that if that is the standard that a reasonable person should have foreseen a suicide risk, you think you make it. But you also think that you don't need to and that on these facts, a serious risk to health, I recognize the proximate cause problem or I think there is a proximate cause problem but your argument is that would be enough because the standard officially is serious risk to health and safety. And I guess that's why I'd be curious to hear from you on this. Maybe you agree but if you could just tell me. Perhaps unsurprisingly. If you're adding the plus factors, is that an argument going towards a question of whether you think that if you had to prove should have known suicide risk, you get there. But if that's not, then how is the prior suicide relevant to just the problem from mild withdrawal? Excessive risk of health or safety. I mean, his honors formulation is perhaps unsurprisingly maybe more eloquent than my own. We don't think it needs to go directly to suicide, right? If you're having a massive depressive episode, you don't need to actually kill yourself before it's something that gets to be treated or needs to be dealt with, right? It doesn't, like the final conclusion isn't the thing that needs to happen. I know, but my point is how is it that things like risk of prior suicide become relevant unless we're trying to ask whether there's a risk of suicide? Right, no, I understand your honors question but what I'm- Do the plus factors only come in if we are in a world where you have to prove should have known about risk of suicide? It's our position, your honor. First of all, that yes, we meet that. Second, the act doesn't need to be completed, right? If somebody is having a mental health crisis and a depressive mental health crisis, they don't need to actively commit suicide before they meet the Darnell standard, right? I mean, you could have somebody with all of these things happening sitting in their cell, you know, in a very troubled state, which would rise to the level of a constitutional violation under Darnell. So the idea that it has to get all the way to suicide or a risk of suicide, I don't think is required. And one thing I do, just I think it's important to kind of conceptualize where we're at here. Yes, but what happened was suicide. So you're not, you know, you're not gonna get damages from some hypothetical, you know, depressive episode that we don't know exactly how that played out or what suffering there was with that. What you're asking for is damages from the suicide. So at the end of the day, even if the standard is somehow more generous to you and more easily met for finding some kind of violation, I guess this is coming under the probable cause heading, could you still have to link that to what actually happened? And what actually happened, I think you're saying, could have been prevented because the serious health risk protocol would have resulted in more, or even the just plain withdrawal protocol would have led under the jail's practices to more frequent visitation. And therefore, at least there's an argument that that would have prevented the suicide. I think that's exactly correct, Your Honor. And these are all jury questions, right? Maybe we get to a jury and they don't buy our proximate cause argument. The legal question, I suppose, though, remains, does it have to be a risk of suicide? If as a matter of law, it's the specific health risk that eventually happened that has to have been reasonably foreseeable. If that's the law, then you have to get to the suicide risk. If that's not the law, then we have this issue of, could a reasonable jury find probable cause, which is a different kind of issue. Those are the two issues, Your Honor. One, we think we make it just with the suicide risk being the thing. Two, we don't think it's actually necessary because the... The other thing that, and maybe this is just going too far for oral argument, but the standard that this court has adopted with all respect to my colleagues who adopted it is totally incoherent. The idea of the subjective standard that's actually objective, the deliberate indifference that doesn't have to be deliberate indifference, what is a should have known standard that boils down to negligence in any reasonable world and is then said not to be a negligence standard. It's just a little bit mind boggling. But why it matters to this case, I guess, is that here are these officers who are handed a sheet. They have protocols. I'm very impressed with the way the jail as a general practice goes about its business. They're assessing people for suicide risk. They're assessing people for health risks. They've got all these protocols and they've got this form. And the answer on the form says no big suicide risk here. And then we're gonna say a reasonable jury could find that people in the defendants, the individual defendants' situation should have known that there was actually a high suicide risk? Yes. Yes, that's correct. Why? Why is that the answer? Why is it fair to hold people to that? For a standard means that. Does it really make sense? So the issue here, and this is one of the things that we've been trying to bring out in our papers and in this argument sort of generally is, at the time she walks in, she is under, she has a bunch of heroin in her system. She is fine, because that's how it works. It is mathematically certain that that will no longer be true the next day. She tells everyone that. Everyone she's talking to saying, I'm going into withdrawal the next day. So a slice of time when she's fine, that you do an analysis on, when she is telling you, I will not continue to be this way, does not somehow magically remove you from liability when the thing that is mathematically certain happens the next day, right? So that's the problem with it. It's not a matter of, is the form bad or did they not ask the questions correctly? It's you have to understand what is happening and what is going to happen. Because she says it, she tells them. Any reasonable human would understand that. And put it another way, are you suggesting that the withdrawal screening form was simply no more than an assessment of her current state of withdrawal and not a predictive form about how her withdrawal would play out? 100%, Your Honor. And that's the, at the time it was done, there is this where she actually is committing suicide. She's just in a very different state that was reasonably foreseeable from what was known. And that's our argument. We can't queue up a lot beyond, well, beyond your time. You have reserved two minutes for rebuttal. Why don't we hear from Attorney Summer? Thank you, Your Honors. Thank you. Good morning, Your Honors. Good morning. Attorney Summer Portale-Rendazzo for the defendant FLEs Jackson and Napolitano. I think as counsel admits, this was a dynamic situation when Ms. Grimaldi presented to the jail on October 27th. And that was the time that Jackson and Napolitano conducted the intake. While Jackson didn't see her personally or speak to her, she relied on Napolitano's interpersonal reactions with her to assess the suicide risk and the withdrawal risk that were present at the time of her intake. Importantly, not only did Napolitano and Jackson assess the risk, she was also seen by Nurse Stewart. And Nurse Stewart wrote in his record that at the time he saw her, which was just before 11 p.m. on October 27th, that, quote, with concurrence between screening officer, correction supervisor, and this RN, routine supervision instituted with understanding this issue may need to be revisited if symptoms of withdrawal reemerge. She was seen the next morning at 10 a.m. That nurse did an assessment of the withdrawal. That's Diaz at this point? Yes, Your Honor. And the numbers were slightly higher than the night prior. However, there were still mild withdrawal symptoms. Counsel did not bring suit against that nurse, but asked this court to overturn summary judgment to Jackson and Napolitano and hold them liable for failing to initiate a constant supervision when all the records and assessment they had done said that it wasn't necessarily warranted because she had mild withdrawal symptoms. At that time. At that time, precisely. And while they could have- And you're saying they specifically, or at least, I mean, Nurse Stewart certainly says this has to be reconsidered in the future. Yes. And so if we look at the people who were on duty that night who are your clients, I guess one of the things you're saying is they're just, assume that we agreed with Mr. Rankin on all the legal theories and whatever else. Your clients are just off the hook because all they said was we're on the night shift for the night shift routine supervision will be fine. And there is some sort of expectation in the record that somebody is going to look at it again in the morning. Yes, it's a dynamic situation. So she was given half hour checks throughout that night into the 28th. And she was taken to medical the next morning and the next afternoon at 1 p.m. So she had two visits to medical after my clients were off duty. She was assessed twice. There was a report that Clonidine was requested indicating that withdrawal symptoms either were getting worse or anticipated to be much worse later in the day. But at that point, the officers could have ascribed constant supervision, 15 minute checks, but the failure that they made, and there were failures, and this suicide could have been prevented, but that doesn't mean that my clients violated her civil rights by failing to initiate a constant supervision. They're balancing resources in the jail. As Your Honor pointed out, if there is an argument that mild withdrawal always requires constant supervision, that's overwhelming on a prison system to have to constantly supervise each potential inmate who's going through withdrawal. It doesn't equate, and the district court said this, it doesn't equate, withdrawal does not equate to a risk of suicide. Collectively, the argument is here it did, but not at the time when my clients did the assessment. And the half an hour of supervision was sufficient up until the point where the withdrawal symptoms worsened. And it's in the record that there was no indication of worsening withdrawal symptoms until Plaintiff Ms. Grimaldi called out at 2.45 p.m. She was seen at one o'clock and at less than two hours before in the medical, and the symptoms weren't bad. So something clearly happened in those intervening time that made the situation worse and could have risen to a level of different supervision or more constant supervision, but that would not fall on my clients in any of it. Okay, I think we have your argument. Why don't we hear from Attorney Collins? Thank you. May it please the court, Deanna Cronin, Deanna Collins from Silverman and Associates on behalf of Apelli Nigro. Good morning, your honors. Good morning. I think I'd like to start at the first instance with an argument presented by Mr. Rankin that your honors were having some discussion over, which is whether this is a case about excessive risk of suicide or excessive risk of health or safety or something else. This is a case about an excessive risk of suicide because we are here because the appellant committed suicide. We're not here because she experienced headache or nausea related to withdrawal symptoms. Let me just back up a second. I take it that the argument from the appellant could go along these lines, that the risk was from withdrawal. Had she engaged in withdrawal systems that turned very serious and she had spasms while lying on a bed and had fallen over, hit her head, and became, I don't know, permanently put into a coma. I don't know that there would be a claim that did the officers know there was a substantial risk of falling off a bed, right? It would have been a substantial risk from going into withdrawal. And I understand that their argument, and this is an oversimplification, is that the risk of suicide in these kind of circumstances is sort of just as foreseeable or the approximate cause link is just as close as falling off the bed would be or something like that. So is that really the case that necessarily it has to be a case where we're asking about the risk of suicide if we were to accept their proposition, and I'm not necessarily saying we do, that the, I don't know, the causal link or the predictive link between withdrawal symptoms and suicide is as close as they argue it is. I think that's a legal question, not a factual question, and Judge Karas in the lower court expressly decided that risk of withdrawal does not equal risk of suicide, at least under these circumstances without additional affirmative evidence that would establish that causal link. Judge Karas cited to another case outside the circuit, of course, in the Western District of Pennsylvania, the Four Sins case, I believe it is, where that court expressly held that. Well, you say it's a legal question, but I take it, you mean by that just based on these facts as a matter of law, the court could conclude. Correct. Not that there is sort of a legal principle that applies across all cases. Correct, correct, Your Honor. I think it's an unjustifiable leap to conclude based on these facts that given the evidence of risk of harm from withdrawal, that we leap to the conclusion that the appellees should have known that Ms. Grimaldi would commit suicide. What are we to make of the fact that a reasonable jury could find on this record that your client in particular did not do what she was supposed to do even on the degree of supervision that was prescribed? Sure. Because after all, I guess Mr. Rankin didn't make this argument here at least. If there was a sufficiently serious risk that everyone should have been aware of that Ms. Grimaldi would go into serious withdrawal, wouldn't it be particularly important, maybe in some other case, regular people in the jail who are just being routinely supervised, if you're 10 minutes late or a half hour late or you never do it at all, nothing terrible is that likely to happen. But everyone knew Ms. Grimaldi. In person they knew her, just know her as a kind of risk. They knew her as a frequent flyer in the jail and someone who was an addict and was always known to have been an addict and who told them that she'd been using all these drugs the day before. Isn't it particularly incumbent to make your times and do the routine surveillance you're supposed to do lest something really bad happens? So Your Honor brings up a great point and I would say that there are two responses to that. The first is we need to look at what occurred prior to the alleged failure that my client had to undergo. To check on her in timely fashion. And those facts include things that Mr. Summers has already identified that happened the previous day. Then at 10 o'clock on the day of the suicide when my client came to work, Ms. Grimaldi did go to the nurse. She had a second COWS protocol assessment done. That protocol assessment again found mild withdrawal symptoms. And then at one o'clock p.m. she was taken back to medical where she didn't complain of suicide ideation at either time and hadn't since then or hadn't before that and simply requested medication for what she anticipated to be a later event. Okay, but the facts are that at that point in time she was still having or experiencing mild withdrawal symptoms. Following that, my client took the inmate outside to the recreation yard where she engaged in what seems to be incredibly normal, appreciative of her life sort of behavior. She was smoking a cigarette. She was joking with inmates. She was talking to people about how she wanted to change her life around. And there is no affirmative evidence in the record that she ever complained about worsening withdrawal symptoms or suicide ideation. So that's. Until she cries out in the. Right. So then the second point comes into what is the deliberate indifference standard versus regular negligence. And we're talking here about a constitutional issue under the 14th Amendment and Subjective Due Process Clause. I want to take a step back and think about what does that clause mean? It means essentially that the conduct aggrieved of has to be somehow extreme or outrageous. And a 10 minute late check in of an inmate by a prison guard, I would argue it doesn't meet that standard. In these circumstances. Correct. Okay, I think we have your argument. Why don't we hear from Mr. Rankin who has reserved two minutes for rebuttal. Mr. Rankin, I have a quick housekeeping. Thank you. I have a quick housekeeping question for you before you get into whatever it is you'd like to add in those two minutes. As I read your brief, you clearly raise a number of arguments in opposition to the grant of summary judgment with respect to Jackson, Napolitano, Negro. I understand that there were no arguments with respect to any of the other individual defendants. Is that right? That's correct, Your Honor. Okay, so you're not pursuing that? Correct. That's not part of your appeal? So the caption on all the briefs is actually wrong. The only appellees in this appeal are the three people who are represented here. And of course that's important because we have to find not just somebody screwed up, but that they screwed up. Yes. Okay, so just to be clear, I just want to make sure in whatever ruling, whether it's for you or against you, the only three appellees who are at issue here are the three individual defendants, Jackson, Napolitano, and Negro. Is that correct? And Putnam County. Okay, you didn't mention that at all. I understand the theory by which you might say, and if I resuscitate any claim against the individual defendants, I would like the chance to pursue my claims under Monell against the county. You didn't say that in the brief at all. We didn't because the issue at the lower level was you don't have a constitutional violation, so. Why not? So that's what we addressed. Practiced if in the future, you need to say it. If you want relief from this court, you gotta tell us what you want. And I think in most circumstances, we would probably say because you didn't even mention a request for relief under Monell that you're out of luck. Whether you are or not, I don't know. But certainly for the future, you need to ask us for what the relief is. And if you don't mention that you want relief against a particular party, it can be a serious problem. But either way, you need one of these three people to be, you need a reversal as to one of these three people for this even to become an issue. That's correct. Yeah, okay, fair enough. Thank you, I just wanted to clarify that. You've got two minutes, and we'll try to stick very closely to the red light here. Yep. So to address some of the arguments that we just heard, the issue about the dynamic situation, especially as it relates to Sergeant Jackson, as the record is clear, that one of her responsibilities is to tell the next shift and convey information about the inmates that are there and also any risks that they have. She did not do that. So it's the knowing that we're gonna have an issue that she doesn't do anything then with is part of the deliberate indifference on her part. Also on Jackson's part, the record shows that she did a very cursory review of the documents, which we posit she should have done more, right? Obviously you have to disregard known risk, right? That's the reckless standard, which is where we're at. So you have to go through a file. She had a lot of information on Ms. Grimaldi. Could have seen that, could have reviewed it, could have made the right call, didn't. And that's the same issue with Napolitano, right? He had the information, he looked at it, and instead of following the jail's policy, which would be to put her on constant supervision, opted for not doing that. And that's the- But what is the right call here? They, even with the benefit of hindsight, made the right call for the shift that they were addressing. And they presumably knew, the nurse knew, that there was gonna be a reevaluation and should be a reevaluation later. Are you saying that Jackson and Napolitano should have, well, I guess you're saying they should have put her on constant supervision right away, but that could be subject to revision the next day anyway, and downgrading as well as upgrading. It's whatever the person in the morning decides that really matters to this outcome, isn't it? Well, I mean, not necessarily. If you look at the policies at the jail, which the lower court, I think, did a nice job of summarizing it, the circumstances that Ms. Grimaldi was in should have warranted 15 minute or constant supervision. The record's clear about that. So that's the issue. Also, the not telling anybody about it, right? And Jackson, the record's also clear that part of Jackson's job duties is to make sure that information is conveyed. And had any of that happened, she'd be alive. We have your argument. We thank counsel for both sides. Very much, very well argued, very helpful. We will take the case under advice. Thank you, Your Honor. We'll turn.